# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| E.C., an individual, | ) Case No.: 2:24-cv-02322 DSF |
| | ) (MAAx) |
| Plaintiff(s), | ) |
| | ) **PLAINTIFF'S FIRST** |
| vs. | ) **AMENDED COMPLAINT** |
| | ) |
| CHOICE HOTELS | ) |
| INTERNATIONAL, INC.; | ) |
| KHANNA ENTERPRISES, LTD, | ) |
| LP; EASTLAND ESTATE LLC; | ) |
| RED ROOF INNS, INC.; RED | ) |
| ROOF FRANCHISING, LLC; | ) |
| TRI-LIN HOLDINGS, LLC; KABIR | ) |
| ONTARIO, LLC; RR ONTARIO, | ) |
| LLC; and JOHN DOE 1 – 10, | ) |
| | ) |
| Defendant(s). | ) |
| | ) |
| | ) |

- 1 -

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

## FIRST AMENDED COMPLAINT

Plaintiff E.C. ("Plaintiff" or "E.C."), by and through the undersigned counsel, respectfully submits her first amended complaint for damages and makes the following averments:

## INTRODUCTION

1. Choice Hotels International, Inc. (hereinafter "Choice"), Khanna Enterprises, LTD, LP (hereinafter "Khanna Enterprises" or "Hotel Defendant" ), Eastland Estate, LLC (hereinafter "Eastland Estate" or "Hotel Defendant"),  Red Roof Inns, Inc. (hereinafter "RRI"), Red Roof Franchising, LLC (hereinafter "RRF") (collectively, RRI and RRF may be referred to as the "Red Roof Defendants"), Tri-Lin Holdings, LLC (hereinafter "Tri-Lin" or "Hotel Defendant"), Kabir Ontario, LLC (hereinafter "Kabir Ontario" or "Hotel Defendant"), RR Ontario, LLC (hereinafter "RR Ontario" or "Hotel Defendant"), and John Doe 1-10 (collectively, Choice and Red Roof Defendants may be referred to as the "Hotel Brand Defendants") know and have known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country. Rather than taking timely and effective measures to thwart this epidemic, the Defendants have instead chosen to ignore the open and obvious

presence of sex trafficking on their properties, enjoying the profit from rooms rented for this explicit and apparent purpose.

2.    This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials E.C., under the Federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

3.    In 2009, when E.C. was a minor, she met a person (hereinafter "Trafficker 1") that groomed her into commercial sexual exploitation. That person used common methods of force, fraud, and coercion to manipulate E.C., controlling every aspect of her life and eventually trafficking E.C. for sex.

4.    E.C.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

5.    E.C., a survivor of sex trafficking, brings this action for damages against Defendants pursuant to the TVPRA, 18 U.S.C. § 1595 and Child Abuse Victim's Rights Act, 18 U.S.C. § 2255. Each Defendant knowingly benefitted from participation in a commercial business venture that they knew or should have known to be engaging in sex trafficking in violation of the TVPRA.

- 3 -

6. E.C. was advertised on www.backpage.com against her will, physically tortured, and sexually exploited under duress at hotels, owned and/or operated by Hotel Defendants, in Ontario, California, Artesia, California, Linthicum, Maryland, including the Red Roof Inn® by Red Roof and Quality Inn® by Choice Hotels.

7. E.C.'s traffickers forced her onto Defendants' properties where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical violence and psychological abuse.

8. E.C. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her victimization and exploitation.

9. E.C. brings this lawsuit in an attempt to hold the Defendants that imprisoned her accountable for facilitating and enabling her trafficking.

10. The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, against the Defendants who enabled, harbored, held, facilitated, or otherwise financially benefited, or any combination of the foregoing, from a sex trafficking venture in which E.C. was

- 4 -

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

trafficked for sex, sexually exploited, and victimized in violation of the TVPRA.

## **PARTIES**

11. Plaintiff E.C. is a natural person and a resident and citizen of the State of California. E.C. is a "victim" of sex trafficking as protected under applicable provisions of the TVPRA.

    a. Due to the sensitive and intimate nature of the issues, Plaintiff E.C. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[1]

    b. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[2] However,

---

[1] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[2] Fed. R. Civ. P. 10(a).

- 5 -

there are exceptions when the issues involved are of a sensitive and highly personal nature.[3] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[4]

    c. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

    d. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety.

---

[3] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[4] Fed. R. Civ. P. 26(c).

PLAINTIFF'S FIRST AMENDED COMPLAINT      2:24-cv-02322 DSF (MAAx)

Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[5]

e. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

12.     Defendant Choice Hotels International, Inc. ("Choice") is a large hotel brand with over 4,200 branded properties worldwide. It is a Delaware corporation with its principal place of business in Rockville, MD and can be served through its registered agent, United States Corporation Company, at 3366 Riverside Dr. Suite

---

[5] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

103, Upper Arlington, OH 43221.

    a. Choice owned, supervised, and/or operated the Quality Inn® ("Artesia Quality Inn") located at 16905 Pioneer Boulevard, Artesia, CA 90701.

    b. Quality Inn® is a Choice Hotels brand property.

    c. Defendant Choice and the Quality Inn® are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Quality Inn® hotel where the Plaintiff was trafficked for sex. Defendant Choice and the Quality Inn® each share the common policies and practices complained of herein.

    d. Defendant Choice and the Quality Inn® jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

    e. As an integrated enterprise and/or joint employer, Defendant Choice and the Quality Inn® are separately and jointly responsible for compliance with all applicable laws.

- 8 -

PLAINTIFF'S FIRST AMENDED COMPLAINT             2:24-cv-02322 DSF (MAAx)

f.  As an integrated enterprise and/or joint employer, Defendant Choice and the Quality Inn® are jointly and severally liable for any damages caused by employees.

g.  Upon information and belief, Defendant Choice controls a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by Choice, Wi-Fi qualifications and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Quality Inn® hotel where E.C. was trafficked.

- 9 -

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

h. Defendant Choice Hotels maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with Choice brand standards and all local, state, and federal laws.

i. Through its relationship with the staff at the Quality Inn® hotel where Plaintiff was trafficked and the perpetrator who trafficked Plaintiff at the Quality Inn®, Defendant Choice Hotels knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

j. Choice Hotels benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

13. Defendant Khanna Enterprises, LTD, LP ("Khanna Enterprises"), doing business as the business formerly known as Quality Inn® ("Artesia Quality Inn"), is a California Limited Partnership with its principal place of business in Irvine, California and can be served through its Registered Agent, Ravi Khanna at

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

2601 Main Street, Suite 320, Irvine, CA 92614.

    a. Defendant Khanna Enterprises was involved in the staffing and operation of the business formerly known as the Artesia Quality Inn

    b. Through its continuous business relationship with in the perpetrators who trafficked E.C. at the Artesia Quality Inn, Defendant Khanna Enterprises knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking violation of the TVPRA.

    c. Khanna Enterprises owned, operated, supervised, and/or exercised control over the business formerly known as the Artesia Quality Inn located at 16905 Pioneer Boulevard, Artesia, CA 90701, where Plaintiff alleges injuries related to her sex trafficking occurred.

    d. At all relevant times, Defendant Khanna Enterprises shared decisions with the real property owner, Choice, who owned, operated, supervised, and/or exercised control over the Quality Inn® ("Artesia Quality Inn")

- 11 -

located at 16905 Pioneer Boulevard, Artesia, CA 90701 during the timeframe in which Plaintiff alleges injuries related to her sex trafficking occurred.

e.  Quality Inn® was a Choice Hotels brand property.

f.  Defendant Khanna Enterprises and Choice were a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Artesia Quality Inn where the Plaintiff was trafficked for sex.

g.  Defendant Khanna Enterprises and Choice each shared the common policies and practices complained of herein.

h.  Defendant Khanna Enterprises and Choice knew for years that sex trafficking and prostitution repeatedly occurred at its Quality Inn® hotel located at 16905 Pioneer Boulevard, Artesia, CA 90701 ("Artesia Quality Inn").

i.  Defendant Khanna Enterprises and Choice jointly employed or ratified the employment of individuals through horizontal joint employment and/or vertical joint employment at the Artesia Quality Inn.

- 12 -

j.  Defendant Khanna Enterprises and Choice benefited financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

14.  Defendant Eastland Estate, LLC ("Eastland Estate"), doing business as the business formerly known as Quality Inn® ("Artesia Quality Inn") is a California Limited Partnership with its principal place of business in Chino Hills, California and can be served through its Registered Agent, Betty Qi at 15433 Fairfield Ranch Road, Chino Hills, California 91709.

a.  Defendant Eastland Estate was involved in the staffing and operation of the business formerly known as the Artesia Quality Inn located at 16905 Pioneer Boulevard, Artesia, CA 90701 where the Plaintiff was trafficked for sex.

b.  Through its continuous business relationship with the perpetrators who trafficked E.C., Defendant Eastland Estate knowingly benefited or received something of value from its facilitation of or participation in a venture

- 13 -

which it knew or should have known had violated the TVPRA.

c. Eastland Estate owned, operated, supervised, and/or exercised control over the business formerly known as the Artesia Quality Inn located at 16905 Pioneer Boulevard, Artesia, CA 90701, where Plaintiff alleges injuries related to her sex trafficking occurred.

d. At all relevant times, Defendant Eastland Estate shared decisions with the real property owner, Choice, who owned, operated, supervised, and/or exercised control over the Quality Inn® ("Artesia Quality Inn") located at 16905 Pioneer Boulevard, Artesia, CA 90701 during the timeframe in which Plaintiff alleges injuries related to her sex trafficking occurred.

e. Defendant Eastland Estate and Choice owned, operated, supervised, and/or exercised control over the Quality Inn® ("Artesia Quality Inn") located at 16905 Pioneer Boulevard, Artesia, CA 90701.

f. Quality Inn® was a Choice Hotels brand property.

- 14 -

g. Defendant Eastland Estate and Choice were a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Artesia Quality Inn hotel where the Plaintiff was trafficked for sex.

h. Defendant Eastland Estate and Choice each shared the common policies and practices complained of herein.

i. Defendant Eastland Estate and Choice knew for years that sex trafficking and prostitution repeatedly occurred at its Quality Inn® hotel located at 16905 Pioneer Boulevard, Artesia, CA 90701 ("Artesia Quality Inn").

j. Defendant Eastland Estate and Choice jointly employed or ratified the employment of individuals through horizontal joint employment and/or vertical joint employment at the Artesia Quality Inn.

k. Defendant Eastland Estate and Choice benefited financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

15. Defendant Red Roof Inns, Inc. ("RRI") is a publicly traded company. The company provides franchise opportunities for its hotel and motel brands through Defendant Red Roof Franchising, LLC ("RRF").[6]

    a. Defendant RRI is a Delaware corporation, with its corporate headquarters and principal place of business located at 7815 Walton Pkwy, New Albany, Ohio 43054. RRI can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr., Suite 103, Upper Arlington, Ohio 43221.

    b. Defendant RRF is a Delaware limited liability company with its corporate headquarters and principal place of business located at 7815 Walton Pkwy, New Albany, Ohio 43054. RRF can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr., Suite 103, Upper Arlington, Ohio 43221.

    c. RRI purchases, owns, and manages a network of hotels and motels globally, primarily in the Midwest, Southern, and

---

[6] Upon information and belief, Red Roof Franchising, LLC is a wholly owned subsidiary of Red Roof Inns, Inc. and serves as Red Roof Inns, Inc.'s franchising arm.

PLAINTIFF'S FIRST AMENDED COMPLAINT    2:24-cv-02322 DSF (MAAx)

Eastern United States. RRI serves customers throughout the United States and other countries throughout the World.

    d. Defendant RRI is a global hotel brand with approximately 650 branded properties worldwide. Red Roof was named one of the fastest growing franchises in 2017.

16.    Red Roof Inn® own, supervise, manage, control, and/or operate the Red Roof branded hotels where Plaintiff E.C. was sex trafficked, sexually exploited, and victimized by traffickers.

    a. Red Roof Inn® owns, supervises, manages, controls, and/or operates the Red Roof Inn located at 1818 E Holt Boulevard, Ontario, CA 91761 ("Ontario RRI").

    b. Red Roof Inn® by Red Roof is a Red Roof branded property.

    c. Defendants hired employees to work at the Ontario RRI. Defendants' employees worked jobs including front desk staff and housekeeping.

    d. Red Roof Inn® are the principal with control over nearly every element of operations at their branded properties, including the Ontario RRI. Defendants are directly and indirectly liable for the acts and/or omissions of the

- 17 -

PLAINTIFF'S FIRST AMENDED COMPLAINT    2:24-cv-02322 DSF (MAAx)

employees at their branded properties where E.C. was trafficked. Defendants have an actual and apparent agency relationship with the property owners of the Ontario RRI to establish vicarious liability.

17. Red Roof Inn® controlled and dictated the actions and inactions of the Ontario RRI by Red Roof through variety of means enforced through franchise agreements and related contracts, including but not limited to:

a. Providing the software, hardware, and platforms where data and information is shared with Red Roof corporate;

b. Providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

c. Providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

d. Providing and controlling customer review and response platforms;

e. Hosting online bookings on Red Roof's domain;

f. Requiring branded hotels to use Red Roof's customer rewards program;

- 18 -

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

g.  Requiring branded hotels to use Red Roof's property management software;

h.  Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

i.  Providing IT support for all property management systems, owned, operated, and required by Red Roof;

j.  setting employee wages;

k.  sharing profits;

l.  standardizing training methods for employees;

m. building and maintaining the facility in a manner specified by the owner;

n.  standardized or strict rules of operation;

o.  regular inspection of the facility and operation by owner; and

p.  fixing prices.

18.  Red Roof Inn® knowingly benefited, or received something of value, from its commercial business ventures at the Ontario RRI through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates

- 19 -

charged through rooms where E.C. was trafficked, as well as in maintaining a positive public image for the Red Roof Inn brand. Red Roof also benefited from gathering personal data from the Wi-Fi it provided to customers including E.C. and her trafficker.

19. Red Roof Inn® is subject to the jurisdiction of this Court because it regularly conducts business in California, including through the operation of numerous hotels in California, contracting to supply services in California. Red Roof has derived substantial revenue from services rendered in California and profited from a commercial business venture which unlawfully permitted criminals to sell E.C. for commercial sex at the Ontario RRI by Red Roof.

20. Defendant Tri-Lin Holdings, LLC ("Tri-Lin"), doing business as the business formerly known as Red Roof Inn® ("Ontario RRI") is a Nevada Limited Partnership with its principal place of business in Las Vegas, Nevada and can be served through its Registered Agent, David Riley at 200 East Del Mar Boulevard, Suite 304, Pasadena, California 91105.

   a. Defendant Tri-Lin was involved in the staffing and operation of the business formerly known as the Red Roof Inn located at 1818 E Hold Boulevard, Ontario, CA 91761

- 20 -

PLAINTIFF'S FIRST AMENDED COMPLAINT          2:24-cv-02322 DSF (MAAx)

where the Plaintiff was trafficked for sex.

b. Through its continuous business relationships with the perpetrators who trafficked E.C., Defendant Tri-Lin knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had violated the TVPRA.

c. Defendant Tri-Lin owned, operated, supervised, and/or exercised control over the business formerly known as the Red Roof Inn® located at 1818 E Holt Boulevard, Ontario, CA 91761, where Plaintiff alleges injuries related to her sex trafficking occurred.

d. At all relevant times Defendant Tri-Lin shared decisions with the real property owner, Red Roof Inns, Inc. (hereinafter "RRI") who owned, operated, supervised, and/or exercised control over the Red Roof Inn ("Ontario RRI") located at 1818 E Holt Boulevard, Ontario, CA 91761 during the timeframe in which Plaintiff alleges injuries related to her sex trafficking occurred.

e. Defendant Tri-Lin and RRI owned, operated, supervised, and/or exercised control over the Red Roof Inn ("Ontario

- 21 -

RRI") located at 1818 E Holt Boulevard, Ontario, CA 91761.

f.  Red Roof Inn® was an RRI branded property.

g.  Defendant Tri-Lin and RRI were a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Ontario RRI hotel where the Plaintiff was trafficked for sex.

h.  Defendant Tri-Lin and RRI each shared the common policies and practices complained of herein.

i.  Defendant Tri-Lin and RRI knew for years that sex trafficking and prostitution repeatedly occurred at its Red Roof Inn ("Ontario RRI") hotel located at 1818 E Holt Boulevard, Ontario, CA 91761.

j.  Defendant Tri-Lin and RRI jointly employed or ratified the employment of individuals through horizontal joint employment and/or vertical joint employment at the Ontario RRI.

k.  Defendant Tri-Lin and RRI benefited financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

- 22 -

21.    Defendant Kabir Ontario, LLC ("Kabir Ontario"), doing business as the business formerly known as Red Roof Inn® ("Ontario RRI") is a California Limited Partnership with its principal place of business in Downey, California and can be served through its Registered Agent, Devang Patel at 10409 Stamps Road, Downey, California 90241.

a. Defendant Kabir Ontario was involved in the staffing and operation of the business formerly known as the Red Roof Inn located at 1818 E Holt Boulevard, Ontario, CA 91761 where the Plaintiff was trafficked for sex.

b. Through its continuous business relationship with the perpetrators who trafficked E.C., Defendant Kabir Ontario knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had violated the TVPRA.

c. Defendant Kabir Ontario owned, operated, supervised, and/or exercised control over the business formerly known as the Red Roof Inn® located at 1818 E Holt Boulevard, Ontario, CA 91761, where Plaintiff alleges injuries related to her sex trafficking occurred.

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

d. At all relevant times, Defendant Kabir Ontario shared decisions with the real property owner, Red Roof Inns, Inc. (hereinafter "RRI") who owned, operated, supervised, and/or exercised control over the Red Roof Inn ("Ontario RRI") located at 1818 E Holt Boulevard, Ontario, CA 91761 during the timeframe in which Plaintiff alleges injuries related to her sex trafficking occurred.

e. Defendant Kabir Ontario and RRI owned, operated, supervised, and/or exercised control over the Red Roof Inn ("Ontario RRI") located at 1818 E Holt Boulevard, Ontario, CA 91761.

f. Red Roof Inn® was an RRI branded property.

g. Defendant Kabir Ontario and RRI were a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Ontario RRI hotel where the Plaintiff was trafficked for sex.

h. Defendant Kabir Ontario and RRI each shared the common policies and practices complained of herein.

i. Defendant Kabir Ontario and RRI knew for years that sex trafficking and prostitution repeatedly occurred at its Red

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

Roof Inn ("Ontario RRI") hotel located at 1818 E Holt Boulevard, Ontario, CA 91761.

j. Defendant Kabir Ontario and RRI jointly employed or ratified the employment of individuals through horizontal joint employment and/or vertical joint employment at the Ontario RRI.

k. Defendant Kabir Ontario and RRI benefited financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

22. Defendant RR Ontario, LLC ("RR Ontario"), doing business as the business formerly known as Red Roof Inn® ("Ontario RRI") is a California Limited Liability company with its principal place of business in Garden Grove, California and can be served through its Registered Agent, Terry D. Tognazzini at 1265 Harbor Boulevard, Garden Grove, California 92840.

a. Defendant RR Ontario was involved in the staffing and operation of the business formerly known as the Red Roof Inn located at 1818 E Holt Boulevard, Ontario, CA 91761 where the Plaintiff was trafficked for sex.

- 25 -

b. Through its continuous business relationship with the perpetrators who trafficked E.C., Defendant RR Ontario knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had violated the TVPRA.

c. Defendant RR Ontario owned, operated, supervised, and/or exercised control over the business formerly known as the Red Roof Inn® located at 1818 E Holt Boulevard, Ontario, CA 91761, where Plaintiff alleges injuries related to her sex trafficking occurred.

d. At all relevant times Defendant RR Ontario shared decisions with the real property owner, Red Roof Inns, Inc. (hereinafter "RRI") who owned, operated, supervised, and/or exercised control over the Red Roof Inn ("Ontario RRI") located at 1818 E Holt Boulevard, Ontario, CA 91761 during the timeframe in which Plaintiff alleges injuries related to her sex trafficking occurred.

e. Defendant RR Ontario and RRI owned, operated, supervised, and/or exercised control over the Red Roof Inn

- 26 -

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

("Ontario RRI") located at 1818 E Holt Boulevard, Ontario, CA 91761.

f.  Red Roof Inn® was an RRI branded property.

g.  Defendant RR Ontario and RRI were a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Ontario RRI hotel where the Plaintiff was trafficked for sex.

h.  Defendant RR Ontario and RRI each shared the common policies and practices complained of herein.

i.  Defendant RR Ontario and RRI knew for years that sex trafficking and prostitution repeatedly occurred at its Red Roof Inn ("Ontario RRI") hotel located at 1818 E Holt Boulevard, Ontario, CA 91761.

j.  Defendant RR Ontario and RRI jointly employed or ratified the employment of individuals through horizontal joint employment and/or vertical joint employment at the Ontario RRI.

k.  Defendant RR Ontario and RRI benefited financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

- 27 -

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

23.     On information and belief, Plaintiff alleged the true names and capacities, whether individual, corporate, associate or otherwise, of Defendants named herein as Does 1 through 10, inclusive, who are unknown to the Plaintiff, and therefore sues said Defendants by such fictitious names. Plaintiff will amend the First Amended Complaint to allege their true names and capacities when such have been ascertained. Upon information and belief, Defendant and each of the said Doe Defendants is responsible in some manner under 18 U.S.C. § 1595 and § 2255(a) for the occurrences herein alleged, which resulted in injury to the Plaintiff as alleged herein.

24.     Whenever reference is made in this Complaint to any act, deed or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## **JURISDICTION AND VENUE**

25.     This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States.

- 28 -

26. The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") and 18 U.S.C. § 2255, Child Abuse Victims' Rights Act ("CAVRA").

27. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

## **SEX TRAFFICKING UNDER FEDERAL LAW**

28. Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

29. To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it's best to address these elements in the reverse. Sex trafficking is slavery

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and § 1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. § 1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

30.    Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity.

31.    Pursuant to 18 U.S.C. §1591(a), all who knowingly provide or obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking. This includes, at a minimum, all of the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex and the 'johns' or 'buyers' who obtain, solicit, or patronize forced

- 30 -

commercial sex.[7]

## FACTUAL ALLEGATIONS

### *The Hospitality Industry's Facilitation of Sex Trafficking*

32.    Human trafficking is the world's fastest growing crime.[8] While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of *all* illegal drugs.[9]

33.    Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

34.    The hospitality industry plays a crucial role in the sex

---

[7] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law *both* categories are 'traffickers'.

[8] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

[9] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

trade.[10] The trope of the "no-tell motel" is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

35.    According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[11] Traffickers and buyers alike frequently use hotel rooms to exploit victims.

36.    Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an "in call".

37.    Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker

[10] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[11] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

- 32 -

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e., those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[12]

38.    The problem is industry wide. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[13]

39.    Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[14] Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-

---

[12] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[13] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[14] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

40. 75% of survivors responding to a Polaris Project survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff.[15]

37. Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation.

38. But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an

---

[15] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).

- 34 -

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

inherent responsibility to deter the crime and can be liable for failing to do so."[16]

39. Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[17]

40. From check-in to check-out, there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel.

---

[16] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[17] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

PLAINTIFF'S FIRST AMENDED COMPLAINT      2:24-cv-02322 DSF (MAAx)

41. Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[18]

42. Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[19] Thus,

---

[18] *Id.* See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[19] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

43. Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[20]

44. The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

45. Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[21] These efforts sought to educate both the public and private sectors on

---

[20] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp- content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[21] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

PLAINTIFF'S FIRST AMENDED COMPLAINT     2:24-cv-02322 DSF (MAAx)

identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[22]

46.    Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

### *The Defendants Control the Hospitality Industry*

47.    Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or a third-party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated

---

[22] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

- 38 -

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

with owning a franchise contract and still profits from putting heads in beds.

48. The average consumer does not see this relationship. The parent brand gives the franchisee property its identity. It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand. The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

49. In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website. Thus, booking and room reservations are controlled by the corporate parent brand.[23]

---

[23] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

PLAINTIFF'S FIRST AMENDED COMPLAINT                2:24-cv-02322 DSF (MAAx)

50.    The franchise hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

51.    Per the franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

52.    At the time of the incidents alleged herein, Defendants owned, operated, and controlled the subject brand hotels.

53.    Parent hotel brands may kick delinquent hotels out of their system but it is at the expense of terminating their royalty payments.

### *Defendants' Willful Blindness to Sex Trafficking at Their Hotels*

54.    Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S.

- 40 -

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

and abroad.[24] The United Nations,[25] international non-profits,[26] and the U.S. Department of Homeland Security,[27] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

---

[24] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[25] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[26] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[27] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

55.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

56.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[28] and domestically in 2010

---

[28] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

with the Department of Homeland Security's Blue Campaign.[29]

These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry, and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

57.    The Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. The Defendants nevertheless do not share such information with other hotel locations, thereby preventing their other hotel locations from acting to protect the victims of such suspected human traffickers.

58.    The Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

---

[29] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

59. The Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

60. A brief examination of just a handful of examples for each Hotel Defendant suffices to show the extraordinary frequency with which the Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

    a. Regarding a July 2016 stay at the Quality Inn located at 16905 Pioneer Blvd., Artesia, CA 90701, a hotel customer wrote a review saying, "Less than 1 star!! Worst place ever. Booked and paid on Priceline and brought confirmation but they have no reservation. I find 2 charges on my card 1 for original 2 night hotel stay 185.00 And second for 234.00 dOuBLe of original charge. After she said there's just a 50.00 hold on my cc. Lights don't work, bathtub plug dosent work , carpet stains everywhere you MUST wear socks and

- 44 -

there's ants all over bathroom . I complain and she says it's an old hotel( motel) it's to be expected. Trashy and dirty with bugs.  Not worth it!!."[30]

    b. Regarding an October 2017 stay at the Red Roof Inn located at 1818 E Holt Boulevard, Ontario, CA 91761, a hotel customer wrote a review saying, "The customer service is terrible all the front desk people have attitude all the Hispanic maids are rude ASF!!! And the front desk people don't care starting with the little skinny one that works during the night and ending with the big fat one....this place is horrible never answer the phones rooms are infested with bedbugs, and the sheets are hardly changed!!! Lots of prostitution going on in this place too!!! Beware of this place"[31]

---

[30] Review of Quality Inn Artesia by Choice Hotels International, Inc. (July 28, 2016), *available at* https://www.yelp.com/biz/quality-inn-and-suites-artesia-2?q=dirty

[31] Review of Red Roof Inn by Red Roof Inn Ontario Airport (Oct. 11, 2017) *available at* https://www.yelp.com/biz/red-roof-inn-ontario-airport-ontario?q=the+customer+service

PLAINTIFF'S FIRST AMENDED COMPLAINT      2:24-cv-02322 DSF (MAAx)

c. Regarding a May 2018 stay at the Red Roof Inn located at 1818 E Holt Boulevard, Ontario, CA 91761, a hotel customer wrote a review saying, "This place is BAD. My boyfriend and I wanted a fun weekend away, we spent most of the time out exploring the city but eventually we needed to sleep. Thats when things went south. I don't know if I should start with the fact that our room key suddenly stopped working or the fact that it took the front desk FOREVER to ready a new key. While my boyfriend was getting the key, I patiently waited by the door, that's when I saw a strange beetle crawl under our door. Lets not get started on how much space was between the carpet and door. You can literally look under the door and see everything that's going on inside the room. The sex sounds of hookers, the cigarette smell, the sketchy mold looking situations in the corners. Needless to say, we left in the middle of the night when the severe

- 46 -

itching skin kicked in. STAY THE HELL AWAY."[32]

    d. Regarding a March 2015 stay at the Red Roof Inn located at 1818 E Holt Boulevard, Ontario, CA 91761, a hotel customer wrote a review saying, "Wtf?! Trust me don't stay here! There are pimps working in the back side parking lot pool area! McDonald's restrooms look nicer. Pay extra $20 bucks stay down the block. Plenty of other hotels in areA....... Damn train!"[33]

### *The Sex Trafficking of E.C.*

61. One of the lives devalued and otherwise adversely affected by the hospitality industry's inattention to the prevention and eradication of sex trafficking was that of E.C.

62. Around October 2009, when E.C. was just seventeen (17) years old, she met a man (hereinafter "Trafficker 1") who she considered a "boyfriend." Through common tactics of manipulation and false pretenses, Trafficker 1 took advantage of their "romantic"

---

[32]Review of Red Roof Inn by Red Roof Inn Ontario Airport (May 1, 2018) *available at*
 https://www.yelp.com/biz/red-roof-inn-ontario-airport-ontario?q=hookers
[33]Review of Red Roof Inn by Red Roof Inn Ontario Airport (Mar. 24, 2015) *available at*
https://www.yelp.com/biz/red-roof-inn-ontario-airport-ontario?q=pimps

PLAINTIFF'S FIRST AMENDED COMPLAINT      2:24-cv-02322 DSF (MAAx)

relationship and E.C.'s innocence, and eventually forced her into commercial sexual acts at Defendants' hotels. Trafficker 1 would maintain control of E.C. by having her monitored by other people, maintaining possession of her belongings, and withholding food from her. Trafficker 1 eventually got E.C. addicted to drugs and leveraged E.C.'s dependence on illegal substances to further maintain control and ensure she could not leave. Trafficker 1 would use a combination of physical violence, manipulation, drug addiction, and intimidation to force E.C. to engage in non-consensual commercial sex acts with ten to twenty buyers at Defendants' hotels each day. Trafficker 1 trafficked E.C. for sex from approximately October 2009 through August 2013.

63. One of Trafficker 1's associates (hereinafter "Trafficker 2") would monitor E.C. early in her trafficking period. After Trafficker 1 was arrested in approximately August of 2013, Trafficker 2 took over the sex trafficking and exploitation of E.C. Trafficker 2 kept E.C. compliant through similar coercive tactics such as physical violence and by withholding her identification documents from her. Trafficker 2 further enforced ownership over E.C. by branding her with his

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

name tattooed across her leg. Trafficker 2 trafficked E.C. for sex from approximately August 2013 through April 2014.

64.    By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, E.C. was held captive and sold for sex by multiple traffickers at Defendants' hotels.

65.    During the time that she was trafficked, Trafficker 1 and Trafficker 2 frequently rented rooms at the Defendants' hotel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in commercial sex with E.C.

66.    Throughout her trafficking, Trafficker 1 and Trafficker 2 connected with "johns" by posting, or causing to be posted, advertisements on Backpage.com advertising E.C.'s availability for commercial sex.

67.    E.C. was forced to have sex with approximately ten to twenty "johns" every day she was trafficked in Defendants' hotels.

PLAINTIFF'S FIRST AMENDED COMPLAINT                                    2:24-cv-02322 DSF (MAAx)

68.    From approximately October 2009 to April 2014, while under the coercive control of Trafficker 1 and Trafficker 2, E.C. was imprisoned in hotel rooms rented mainly by Trafficker 1 or Trafficker 2 and forced to engage in commercial sex for the benefit of Trafficker 1, Trafficker 2, and the Hotel Defendants. During that time, E.C. was routinely trafficked in the following hotels:

   a. Quality Inn by Choice, located at 16905 Pioneer Blvd, Artesia, CA 90701;

   b. Red Roof Inn located at 1818 E Holt Boulevard, Ontario, CA 91761.

69.    During the time she was trafficked, E.C.'s traffickers constantly shuffled her back and forth among Defendants' branded hotels, often visiting the same hotels repeatedly at intervals.

70.    While at the Defendants' hotels, E.C.'s traffickers violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape.

71.    During her captivity at Defendants' hotels, E.C. was raped, continuously abused physically and verbally, psychologically

- 50 -

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

tormented, kidnapped, and imprisoned in Defendants' brand hotels listed above.

72.    Every time E.C. interacted with Defendants' staff, it was readily apparent that E.C. was under the control of traffickers.

73.    The traffickers followed a repetitive and routine procedure during stays at the Defendants' hotels to which Defendants' hotels knew or should have known of E.C.'s trafficking because of a variety of factors detailed below:

***The Sex Trafficking of E.C. at the Artesia Quality Inn***

74.    Beginning while Plaintiff E.C. was a minor, Plaintiff was subject to sex trafficking at the Quality Inn by Choice, located at 16905 Pioneer Blvd, Artesia, CA 90701 (hereinafter the "Artesia Quality Inn").

75.    Trafficker 1 trafficked Plaintiff for sex at the Artesia Quality Inn approximately between October 2009 and August 2013, staying consecutively for about a week each stay, encountering the same hotel staff. Trafficker 1 maintained control over E.C. through violence, manipulation, drug dependence, and constant monitoring.

76.    At the Artesia Quality Inn, Trafficker 1 or his associate would check in with their real names. Trafficker 1 or his associate

- 51 -

would check in using cash or prepaid credit card for one night and then extend their stay each day at checkout with cash or prepaid credit card.

77. At the Artesia Quality Inn, there was constant foot traffic and loud sounds of abuse coming from the room. Hotel staff would intentionally assign adjoining rooms in the back of the hotel, near the exit doors. At all hours of the day and the night, the staff would have witnessed "johns" come into the main entrance and make their way to E.C.'s room. Security cameras were present at this hotel and would have caught such unusual and suspicious activity on the premises. It was a common practice by Trafficker 1 to tip the housekeepers to stay out of the room and stay quiet.

78. Each day at the Artesia Quality Inn resulted in several consistent red flags, including, but not limited to: paying for stays in cash or prepaid card; obvious signs of illegal drug use; frequent requests for linen changes; unusually large numbers of used condoms left in the trash; unusually large number of male visitors going in and out of E.C.'s room; physical abuse in public spaces; visible signs of prior/private physical abuse; visible signs of malnourishment; and

- 52 -

living out of the hotel room. These red flags were open and obvious to anyone working at the Artesia Quality Inn.

79. Trafficker 1 forced E.C. – who was both underage and a minor at the time – to only enter the Artesia Quality Inn through the back door. Once E.C. reached the age of majority, Trafficker 1 allowed her to enter the hotel alone, with Trafficker 1, or with any of Trafficker 1's associates.

80. Plaintiff E.C. was openly choked and physically assaulted by Trafficker 1 in the lobby of the Artesia Quality Inn. Despite obvious red flags and apparent physical violence, hotel staff at the Artesia Quality Inn failed to notify law enforcement or report the incident, leaving E.C. helpless.

81. Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at the Artesia Quality Inn.

### *The Sex Trafficking of E.C. at the Ontario Red Roof*

82. Plaintiff E.C. was subject to sex trafficking at the Red Roof branded Red Roof Inn located at 1818 E Holt Boulevard, Ontario, CA 91761 (hereinafter the "Ontario Red Roof").

83. Plaintiff E.C. was trafficked by Trafficker 1 and Trafficker2 in succession at the Ontario Red Roof from

- 53 -

approximately October 2009 to April 2014, staying consecutively for a few days, encountering the same staff. Trafficker 1 and Trafficker 2 maintained control over E.C. through physical violence, manipulation, drug dependence, constant monitoring, and debt bondage.

84.  At the Ontario Red Roof, Trafficker 1, Trafficker 2, or any of Trafficker 1's associates would check in to the hotel using their names. Trafficker 1 and Trafficker 2 would check-in using cash or prepaid credit card for one night and then extend their stay each day at checkout with cash or prepaid card.

85.  At the Ontario Red Roof, there was constant foot traffic and loud sounds of abuse coming from the room. At all hours of the day and the night, the staff would have witnessed "johns" come into the main entrance and make their way to E.C.'s room. Security cameras were present at this hotel and would have caught such unusual and suspicious activity on the premises. It was a common practice by Trafficker 1 and Trafficker 2 to tip the housekeepers to stay out of the room and stay quiet.

86.  Each day at the Ontario Red Roof resulted in several consistent red flags, including, but not limited to: paying for stays in

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

cash or prepaid card; obvious signs of illegal drug use; frequent requests for linen changes; unusually large numbers of used condoms left in the trash; unusually large number of male visitors going in and out of E.C.'s room; physical abuse in public spaces; visible signs of prior/private physical abuse; visible signs of malnourishment; and living out of the hotel room. These red flags were open and obvious to anyone working at the Ontario Red Roof.

87.    Trafficker 1 forced E.C. – who was both underage and a minor at the time – to only enter the Ontario Red Roof through the back door. Once E.C. reached the age of majority, Trafficker 1 allowed her to enter the hotel alone, with Trafficker 1, or with any of Trafficker 1's associates.

88.    Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at the Ontario Red Roof.

### *The Defendants Facilitated the Trafficking of E.C.*

89.    Each Defendant is a signatory of the ECPAT Code[34] and thereby have promised to adopt these policies to combat trafficking.

---

[34] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

- 55 -

Yet, Defendants have failed to implement most, if not all these policies.

90.    Defendants profited from the sex trafficking of E.C. and knowingly or negligently aided her traffickers in their sexual exploitation of E.C. The Defendants consistently leased rooms to E.C. or E.C.'s traffickers, when they knew, or should have known, that they were using their hotel rooms to imprison E.C., physically assault her, and subject her to repeated sexual exploitation as they forced her into sexual servitude.

91.    Defendants knew, or should have known, that E.C. was being trafficked and that Defendants were knowingly benefiting financially from said exploitation, because E.C.'s traffickers frequented the Defendants' branded hotels.

92.    Defendants knew, or should have known, that E.C. was being trafficked because E.C. constantly entertained traffic to attain her traffickers' daily quotas, and her traffickers would help check her in then not proceed to the room. Each trafficker engaged in suspicious behavior that indicated they were using the Defendants' hotel rooms for their illegal activities.

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

93.    Defendants knowingly or negligently provided lodging to E.C.'s traffickers for the purposes of harboring E.C. while they were trafficking, abusing, and exploiting her.

94.    Defendants profited from the sex trafficking of E.C. and knowingly or negligently aided E.C.'s traffickers in their sex trafficking scheme. The Defendants took no action as E.C. repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and exhibiting signs of malnourishment, and often displaying prominent bruising all over her person.

95.    Defendants participated in and facilitated this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from E.C. in which to harbor E.C. while she was being trafficked.

96.    Defendants had the opportunity to stop E.C.'s traffickers and offenders like them from victimizing E.C. and others like her. Instead, the Defendants failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

97.    Defendants financially benefited from the sex trafficking of E.C., and other victims like her, and developed and maintained

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

business models that attract and foster the commercial sex market for traffickers and buyers alike

98. Defendants enjoy the steady stream of income that sex traffickers bring to their budget level hotel brands, such as Red Roof Inn® by Red Roof and Quality Inn® by Choice Hotels.

99. Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

100. Despite such obvious indicators of illegal activity and sex trafficking, Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties.

101. Defendants maintained their deficiencies to maximize profits by:

    a. Foregoing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

    b. Failing to refuse room rentals, or report guests to law

PLAINTIFF'S FIRST AMENDED COMPLAINT      2:24-cv-02322 DSF (MAAx)

enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms were rented to sex traffickers or buyers; and

   c.  Reducing security costs by foregoing proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation.

102.  As a direct and proximate result of the Defendants' egregious practices, E.C. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### COUNT ONE:  18 U.S.C. § 1595

### Trafficking Victims Protection Reauthorization Act of 2008

### ("TVPRA")

### (Against all Defendants)

103.  The Plaintiff E.C. incorporates each foregoing allegation.

PLAINTIFF'S FIRST AMENDED COMPLAINT         2:24-cv-02322 DSF (MAAx)

104.  E.C. is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

105.  The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, the Defendants had a statutory obligation not to benefit from a venture that they knew, or should have known, to engage in violations of the TVPRA, including violations of 18 U.S.C. § 1591(a). At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of E.C. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

106.  The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefitted from the trafficking of E.C. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

commissions alleged in this pleading were the but for and proximate cause of E.C.'s injuries and damages.

107. E.C. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties.

## COUNT TWO: 18 U.S.C. § 2255(a)

## Child Abuse Victims Rights Act ("CAVRA")

## (Against All Defendants)

108. Plaintiff incorporates each forgoing allegation.

109. Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

110. Plaintiff was the "victim" of violations of 18 U.S.C. §§ 1589, 1590, and 1591. 125. Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

111. Plaintiff was a "person" who "has not attained the age of 18 years" pursuant to 18 U.S.C. § 1591(a)(2).

112. Defendants knew that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause Plaintiff to engage in a commercial sex act, pursuant to 18 U.S.C. § 1591(a)(2).

- 61 -

113.    Defendants knowingly "harbored" and/or "maintained" Plaintiff, pursuant to 18 U.S.C. 1590(a)(1), by providing her and her trafficker rooms in hotels affecting interstate commerce where authorities were unlikely to discover the injuries being sustained by Plaintiff.

114.    Defendants knowingly benefited, financially or by receiving anything of value, from participation in a venture that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff to engage in commercial sex acts.

115.    Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

### **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she

- 62 -

sustained due to the Defendants' conduct outlined as follows:

    a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

    b. Disgorgement of profits obtained through unjust enrichment;

    c. Restitution;

    d. Statutory and/or treble damages, where available;

    e. Punitive damages;

    f. Attorneys' fees and expenses;

    g. The costs of this action;

    h. Pre- and post-judgment interest; and

    i. Any other relief the Court or jury deems appropriate.

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the

- 63 -

Plaintiff, and against the Defendants, and that it awards damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

## THE PLAINTIFF DEMANDS A TRIAL BY JURY

Dated: April 11, 2024

RESPECTFULLY

SUBMITTED,

/s/ *Karen Barth Menzies*
KBM Law, Corp.
6701 Center Drive West
Suite 1400
Los Angeles, CA 90045
T: (310) 363-0030
F: (310) 861-0168
E: kbm@kbmlaw.com

- 64 -

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)

Kimberly L. Adams
Susanna Southworth, PhD
(Pro Hac Vice Application
Forthcoming)
Levin, Papantonio, Rafferty,
Proctor, Buchanan, O'Brien,
Barr & Mougey, P.A.
316 S. Baylen Street, Ste. 600
Pensacola, FL 32502-5996
T: 850-435-7164
E: kadams@levinlaw.com

*Attorneys for Plaintiff E.C.*

PLAINTIFF'S FIRST AMENDED COMPLAINT                    2:24-cv-02322 DSF (MAAx)